TP

AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>LISETTE LEE<br><br>*Defendant* | )<br>)<br>) Case No. 2:10-MJ-392<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __06/14/2010__ in the county of __Franklin__ in the __Southern__ District of __Ohio__, the defendant violated __21__ U. S. C. § __841(a)(1); 846__, an offense described as follows:

Did knowingly and intentionally, possess with the intent to distribute; and conspire to possess with the intent to distribute a controlled substance (marijuana), a Schedule I controlled substance, in excess of 100 kilograms, to wit: (229.99 kilograms)

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Matthew Heufelder, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/15/2010

_____
Judge's signature

City and state: Columbus, Ohio

U.S. Magistrate Judge Elizabeth A. Deavers
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Matthew J. Heufelder, (hereafter referred to as affiant) being duly sworn depose and state:

Your affiant is an "investigative or law enforcement officer" of the United States within the meaning of Title 18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18 U.S.C. § 2516. Your affiant has been employed by the DEA since January, 1996. Your affiant is empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of Title 21 U.S.C. § 878. During this time, your affiant has accumulated the following training and experience:

(a) I graduated from the DEA Academy located at the FBI Academy, Quantico, Virginia. I received approximately 16 weeks of specialized narcotics related training. The training included controlled substances identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical application of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects including latent fingerprint collection and analysis.

(b) During the course of my law enforcement career I have had experience in debriefing defendants; interviewing participating witnesses, cooperating individuals and other persons who have personal knowledge and experience regarding the amassing, spending, conversion, transportation, distribution and concealment of records and proceeds of trafficking in controlled substances.

(c) As a DEA agent, I have participated in the execution of numerous search warrants at the residences and businesses of narcotics traffickers, safe houses, crack houses and have participated in numerous for these drug related offenses. I have drafted in excess of 50 federal DEA search warrants.

(d) As a DEA agent, I have participated in investigations targeting individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine and other controlled substances as defined in 21 U.S.C. § 801. I know that marijuana is a controlled substance under 21 U.S.C. § 801.

## INVESTIGATIVE BACKGROUND

1. Based upon my training, experience and my review of the evidence gathered by agents and narcotics detectives assigned to this investigation, there is probable cause to believe that Lisette LEE and others have violated 21 U.S.C. 846, conspiracy to possess with intent to distribute; and 21 U.S.C 841(a)(1), possession with intent to distribute; in excess of 100kg of marijuana (approximately 229.9kg/ 505.78 pounds). This affidavit is in support of a request for the issuance of a Federal complaint and arrest warrant for Lisette LEE.

2. On 6/14/2010 DEA Columbus received information from the DEA Los Angeles Airport Interdiction group regarding suspicious flights originating in Van Nuys, CA and arriving in Columbus, OH at Port Columbus Airport via Lane Aviation. The information that was suspicious to the Airport Interdiction group included, but was not limited to, the following facts: That Lisette LEE had recently chartered a flight from Van Nuys to Columbus, Ohio. LEE travelled with several individuals with an excessive amount of luggage. On each occasion the passengers purported they were moving to Columbus, OH and the excess luggage consisted of supplies for a horse farm in Columbus, OH that had been recently purchased. Lee arranged for a second flight, from Van Nuys, CA, to Columbus, OH, also with several individuals with an excessive amount of luggage, for the purpose of moving to Columbus, OH. This second flight was to take place on a Gulfstream aircraft bearing tail# N711GL, which was due to arrive in Columbus, OH on 6/14/2010 at approximately 6:45pm. Through their training and experience your affiant and other investigators involved believed this group was transporting large amounts of controlled substances and/or proceeds.

3. On 6/14/2010 surveillance was established in the area of Lane Aviation prior to the scheduled arrival time of the aircraft. Agents identified three vehicles

2

associated with the individuals in the Gulfstream awaiting the aircraft's arrival inside the secured area of Lane Aviation. At approximately 6:40pm the Gulfstream (tail# N711GL) arrived and taxied to the terminal. Four individuals, later identified as Lisette LEE, Meili Cady, Frank Edwards and Chris Cash, departed the plane. These were the only passengers on the flight. Edwards and Cash were observed assisting baggage personnel offload 13 large suitcases and several carry on-sized bags; these bags appeared heavy and several suitcases were carried by two men. The three vehicles, described as a rented white Escalade, occupied by Edwards (driver), and LEE (passenger), and a black Suburban and a grey van (these two vehicles were operated by hired drivers from a car service). The 13 large suitcases were loaded into the Suburban and van, the 4 passengers split up in the 3 vehicles, and all 3 vehicles departed Lane Aviation together. The vehicles were approached by marked units as they exited onto the street. At this time agents and uniformed police officers approached the group and identified themselves as law enforcement. All individuals were identified and agents inquired about the nature of their trip. During this time a K-9 'sniff' of the three vehicles resulted in a positive alert to the odor of narcotics on the grey van and black Suburban. 23 bales of marijuana weighing approximately 229.9kg (505.78 pounds) were subsequently seized from 13 of the large suitcases that had been offloaded from the Gulfstream.

4. LEE was advised the vehicles were stopped because agents had reason to believe drugs were being transported on the plane. LEE replied (without being asked a question), that she was a model and a recording artist, that Cady and Cash are her personal assistants, and Edwards is her bodyguard. LEE added she came to visit a boyfriend, did not know his last name, and was asked to transport some equipment and belongings from California to a horse farm this individual had recently purchased in Ohio.

5. After the positive K-9 alert and seizure of marijuana, all 4 individuals were transported to DEA Columbus for positive identification and interviews.

3

6. LEE was advised of her Miranda warnings verbally and in writing, signed a DEA-71 form, Miranda Advisement, and agreed to answer questions. In substance, and among other things, LEE stated the following:

-This is the fourth similar trip she has organized.

-LEE, Edwards and Cady have been on all 4 trips, this is the second trip which Cash has been present.

-Earlier in 2010 she was introduced to an individual in a casino in California by her friend David Garrett and was told he is an importer/ exporter and had recently purchased a horse farm in Ohio.

-LEE agreed to organize trips to Columbus, OH to transport equipment and belongings to the horse farm; LEE was directed by David Garrett on each occasion and has had little or no contact with the individual who owns the horse farm since.

-Prior to each trip Garrett supplied $60,000 in cash to cover the cost of the charter flight (approximately $50,000 per trip), expenses, and payment for LEE's employees (totaling approximately $10,000); Also prior to each trip Garrett would deliver the 12-14 suitcases to one of LEE's Los Angeles area residences.

-Upon arriving in Columbus LEE and the others delivered the luggage supplied by Garrett to an area hotel room, left a key for Garrett at the desk, then left the area. LEE does not know if Garrett was actually in Columbus or if someone else picked up the key.

-LEE and the others would remain in Columbus for 2-3 days until LEE was contacted by Garrett to return to the same hotel room, retrieve a lesser amount of suitcases, and return to Los Angeles. Upon arriving in California, one (or all) of the group delivers the suitcases they returned with to Garrett.

-LEE stated she has the resources to complete these trips since she travels frequently and her family has a charter service on retainer; LEE listed several multi-million dollar businesses of which she and her family are associated.

-LEE paid the charter company for the aircraft, paid for everyone's hotels in Columbus, and the car service with a credit card, then paid her family's concierge the money David had provided.

7. LEE stated she has never seen, been to, or heard of again, the horse farm that they were originally bringing supplies to. LEE did not have an answer when asked if why they were taking some of the same suitcases back that they brought out to Ohio, or why they had to leave the suitcases in a hotel room unattended.

8. LEE stated that she and the others eventually knew David's story was false and that they were likely transporting something illegal. LEE believed they were transporting "weapons and money laundering or something".

9. Among the items seized from LEE's bag were 3 cellular telephones, approximately 34.7gg cocaine, 33.5gg marijuana, drug use paraphernalia, and suspected drug ledgers. LEE admitted to the bag, the phones, the marijuana, the cocaine and paraphernalia being hers, but stated she had never seen the suspected ledgers. These ledgers are consistent with others your affiant is familiar with and had amounts totaling greater than $300,000.00. At the conclusion of the interviews LEE was placed under arrest without incident.

10. Edwards, Cash, and Cady were also interviewed, gave statements regarding their knowledge of this and previous trips and then released. Edwards, Cash, and Cady each signed Rights Waiver forms and answered questions. In summarizing the independent statements of Edwards, Cash, and Cady, each stated that they were either employed or directed by LEE, their expenses for each trip were paid by LEE, and had no direct knowledge of narcotics being transported. Like LEE, Edwards and Cady became suspicious they were involved in something illegal but were not certain exactly what. Neither Edwards, Cash, or Cady stated they ever opened any suitcases during these trips.

5

11. Your affiant believes from his training and experience that LEE organized and facilitated the transportation of marijuana from California to Columbus, OH and of the proceeds back to California.

12. Based on this information, your affiant believes probable cause exists that Lisette LEE and others have violated 21 U.S.C. 846, conspiracy to possess with intent to distribute; and 21 U.S.C 841(a)(1), possession with intent to distribute in excess of 100kg of marijuana (approximately 229.9kg/ 505.78 pounds).

Matthew Heufelder
Special Agent
Drug Enforcement Administration

Subscribed and Sworn to before me
This 15th day of June, 2010.

Elizabeth A. Preston Deavers
U.S. Magistrate Judge
Southern District of Ohio

6